# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS

**FILED**

No. 00-50175

MAY 2 4 2001

D.C. Docket No. SA-94-CV-697-EP

CHARLES R. FULBRUGE III
CLERK

MAY SHABOON, MD

*FILED*

        Plaintiff - Appellee

AUG 2 0 2001

v.

CLERK, U.S DISTRICT COURT
WESTERN DISTRICT OF TEXAS

CHARLES A DUNCAN, Etc; ET AL

BY _____ DEPUTY CLERK

        Defendants

CHARLES A DUNCAN, MD; TONI DOLLINGER, MD; UNIVERSITY OF
TEXAS HEALTH SCIENCE CENTER AT SAN ANTONIO, TEXAS

        Defendants - Appellants

Appeal from the United States District Court for the
Western District of Texas, San Antonio.

Before JONES, and DeMOSS, Circuit Judges, and BARZILAY*, Judge.

### J U D G M E N T

    This cause was considered on the record on appeal and was argued by counsel.

    It is ordered and adjudged that the judgment of the District Court is affirmed in part and reversed in part.

    IT IS FURTHER ORDERED that plaintiff-appellee pay to defendants-appellants the costs on appeal.

ISSUED AS MANDATE: AUG 1 5 2001

_____

\*    Judge, U.S. Court of International Trade, sitting by designation.

A true copy
Test

Clerk, U. S. Court of Appeals, Fifth Circuit

By _____   AUG 1 5 2001
Deputy

New Orleans, Louisiana

REVISED - June 12, 2001

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
FILED
MAY 24 2001
CHARLES R. FULBRUGE III
CLERK

No. 00-50175

MAY SHABOON, M.D.

Plaintiff-Appellee,
v.

CHARLES A. DUNCAN, M.D., ETC.; ET AL.,

Defendants,

CHARLES A. DUNCAN, M.D.; TONI DOLLINGER, M.D.; UNIVERSITY OF
TEXAS HEALTH SCIENCE CENTER AT SAN ANTONIO, TEXAS,

Defendants-Appellants,

Appeal from the United States District Court for the
Western District of Texas

May 24, 2001

Before JONES and DeMOSS, Circuit Judges, and BARZILAY,* District
Judge.

EDITH H. JONES, Circuit Judge:

Plaintiff-appellee Dr. May Shaboon sued the appellants,

and many other parties, on numerous federal and state claims after

she was terminated from a state school's medical residency program.

———

*Judge, U.S. Court of International Trade, sitting by
designation.

The trial court painstakingly sifted through Shaboon's claims, granting dismissals or summary judgment to most of the defendants. Drs. Duncan and Dollinger were denied summary judgment on some of their claims of qualified immunity, and the medical school unsuccessfully sought Eleventh Amendment immunity against Shaboon's ADA claim.  On appeal by these remaining defendants, we sustain the doctors' contentions but conclude that the Health Science Center's immunity claim is best reviewed by the district court in the first instance, following a recent Supreme Court decision.

### FACTUAL AND PROCEDURAL HISTORY

Appellant University of Texas Health Science Center at San Antonio ("Health Science Center") is a state-sponsored medical school.

Under a contractual arrangement, doctors in post-medical-school residency programs at the Health Science Center have clinical privileges at a hospital owned by the Bexar County Hospital District ("Hospital District") and the local VA Hospital. Residents receive a stipend from one of the hospitals and may treat patients under the supervision of hospital staff physicians.  The residents sign a memorandum of understanding with the hospitals stating that, "under no circumstances will either Party terminate this agreement prior to its expiration date without prior notice and without providing the other party the opportunity to discuss

freely any differences, dissatisfactions, or grievances that may exist." If the Health Science Center terminates a doctor's residency, that doctor loses clinical privileges at the hospitals.

Shaboon began the second year of a three-year internal medicine residency at the Health Science Center in August 1993. The director of her residency program was appellant Dr. Charles Duncan, a professor at the Health Science Center. Duncan also served on the Hospital District's executive committee, which plays a central role in administering corrective actions.

On August 2, Shaboon had just finished a week in which she claimed to have worked one hundred and eight hours. Duncan sent her home because she looked tired. Shaboon returned on August 3 and observed a morning report in which Duncan and several residents were discussing a mentally ill patient. Shaboon stated that the residents were pointing and laughing at her, and she believed that the group was talking about her. According to Duncan, Shaboon actually believed she was the patient. Based on this event, he persuaded her to see a psychiatrist.

Appellant Dr. Toni Dollinger, the Chief Resident in psychiatry at the Health Science Center, examined Shaboon. Dollinger's notes from the exam state that Shaboon was very tense, guarded, and moderately depressed. Shaboon discussed the morning incident and stated that she was not recording her patient

3

interactions on charts.   Shaboon reportedly was having trouble sleeping and could not manage her patients and interns.   She was not violent or suicidal.   Dollinger testified in deposition that Shaboon was not thinking rationally, but was capable of making an informed decision about seeking hospitalization.

Dollinger concluded that Shaboon satisfied the criteria for involuntary hospitalization.   She urged Shaboon to check into a mental hospital voluntarily, and threatened to fill out involuntary commitment paperwork if Shaboon did not.

Shaboon has a different account of Dollinger's warning. Dollinger reportedly said the police would take Shaboon to a mental hospital in handcuffs if she did not go voluntarily.   Dollinger allegedly said that Shaboon's friends would witness this and laugh, which would be bad for Shaboon's mental health.   Dollinger allegedly also stated that an involuntary commitment would taint Shaboon's professional record.

Although Dollinger said that she did not threaten to have the police escort Shaboon to the hospital, she testified that it was "fairly common" for police to escort patients involuntarily to a hospital. Dollinger testified that she had initiated involuntary commitments over fifty times, and that she had called the police to escort patients on some of those occasions.   She could not

4

specifically recall whether the police had handcuffed her patients, but said "I imagine if they were combative they were [handcuffed] ."

Shaboon agreed to go to the Villa Rosa mental hospital on her own.  Dr. Christopher Ticknor examined Shaboon there.  In an admission history dictated August 4, he wrote that upon admission Shaboon was fully oriented to person, place, date, and time, and that she was not a danger to herself or to others.  Ticknor found that Shaboon was suffering from major depression, and that she was suffering from severe psychosocial stressors and obsessive ruminations about her professional performance.  He found that she was "psychologically and physically exhausted and ha[d] deprived herself of sleep, normal appetite and relaxation . . . ."  Ticknor concluded that "[h]ospitalization is indicated because of the severity of the patient's depression and the paralyzing nature of her obsessive-compulsive disorder."

Shaboon remained at Villa Rosa until August 11.  She decided to leave against Ticknor's recommendation, but did not immediately return to work or ask for time off.  Despite his efforts to contact Shaboon, Duncan did not see her until August 16. When he saw her, he said she was absent without leave and required her to produce a psychiatric report confirming that she could resume treating patients.

Dr. Eileen Smith then evaluated Shaboon.   Shaboon had stopped taking psychiatric medications that Ticknor had prescribed for her because they made her sick.   Smith told Duncan that Shaboon was not ready to return to work.   Ticknor confirmed this to Duncan. With Shaboon's consent, Duncan received copies of psychiatric records from Ticknor and Smith.   According to records from Ticknor's hospital, Shaboon told doctors that her father sexually abused her when she was a child.

Duncan decided to keep Shaboon away from patients and told her to report daily to a conference room next to his office and read medical literature.   He testified that he lacked authority to suspend her clinical privileges, and that only the Hospital District could do so.   Duncan stated that he removed her from practicing temporarily on August 3, and characterized this as "redirecting" her activities.   He said that he really wanted her to seek care and resolve her mental illness.

In an August 20 letter, Duncan and another professor at the Health Science Center placed Shaboon on probation with respect to her residency because of her mental illness and her refusal to cooperate with psychiatrists.   The letter stated that Shaboon was not cooperating with Duncan and warned that the Health Science Center would dismiss her if she did not improve her behavior and performance.

6

Concurrently, Duncan began to discuss procedures to revoke Shaboon's clinical privileges with Dr. Nicholas Walsh, president of the Hospital District's medical-dental staff, and the district's legal counsel. Duncan wrote in a personal memorandum of August 18 that he had ordered Shaboon to prepare a statement about her difficulties in the program, but she did not initially cooperate with the order.

Duncan wrote to Walsh on August 19, requesting assistance under Hospital District bylaws to discipline Shaboon. Duncan testified in deposition that he believed the bylaws allowed Walsh to suspend Shaboon's privileges unilaterally.

The appellants assert that the Hospital District suspended Shaboon's clinical privileges at this point. They point to testimony and an October 4 Advocacy Committee letter suggesting that the Hospital District suspended her on an unspecified date in late August. Hospital District records show, however, that the district never suspended Shaboon. Walsh also could not recall suspending her.

At Duncan's suggestion, Shaboon met with doctors on the Hospital District Physicians Advocacy Committee ("Advocacy Committee"), which assists disciplined physicians in Hospital District proceedings. The committee members, themselves psychiatrists, asked to see Shaboon's psychiatric records and talk

to her psychiatrist at the time, Dr. Malathi Koli.  Shaboon offered
only to give them Koli's opinion on her medical fitness and to
receive written questions for Koli.  She stated in her deposition
that she did not want doctors in the hospital to know about her
childhood sexual abuse.  Duncan also asked to speak to Koli, but
Shaboon offered him the same limited disclosure.

Rather than treat patients, Shaboon continued to report
to the conference room, and later the hospital library, during
September.  Shaboon said that Duncan would not permit her to talk
to other doctors about her situation or attend resident conferences
and meetings.  She alleged that during this period, Duncan taunted
her about the descriptions of sexual abuse in her medical records.
He reportedly made statements such as  "I guess you don't want to
talk about your father, huh," and "I guess you don't like being
touched."

On September 10, the Advocacy Committee wrote a letter
requesting full access to medical records from Ticknor and Koli.
The  letter  stated  that  the  committee  could  not  recommend
reinstatement of her privileges if she did not sign consent forms.
Shaboon did not comply with the request.

On  September  28,  Duncan  and  another  professor  sent
Shaboon  a  letter  giving  her  "formal  notification"  of  her
probationary status in the residency program.  The letter also

8

stated that her clinical privileges had been suspended back on August 20.  In addition, the letter asked for full access to Dr. Koli and warned that the Health Science Center would terminate her residency if she did not cooperate.  The letter encouraged her to hire legal counsel.

Shaboon retained attorney Raymond Karam.  Karam met with Duncan and Jack Park, the Hospital District's executive director of institutional services.  Duncan and Park stated that Shaboon had three options: she could resign, take a potentially permanent leave of absence, or be fired by October 11.

Duncan and the acting chairman of the Health Science Center Department of Medicine gave Shaboon an "intent to dismiss" letter on or about October 12.  The letter cited her "failure to satisfy academic requirements."  "The deficiencies you have demonstrated regarding your ability to care for patients and your refusal to cooperate with our efforts to help you have caused you to fail three months of your training."  The letter concluded, "[i]f you can provide any evidence or reason to us as to why you should not be dismissed from the program, then we will consider that information prior to final dismissal procedures."

Shaboon sent a letter to Duncan on October 14 asking to remain in the program and to be allowed to make up lost time.  The Health Science Center formally dismissed Shaboon on October 15.

9

The VA Hospital terminated Shaboon, ending her salary, on October
20.

Duncan's secretary told University police on October 27
that Shaboon called and threatened Dr. Janet Blodgett's children.
Blodgett was an assistant professor who had supervised Shaboon
during Shaboon's first year.   Blodgett signed a typed police
affidavit a month later that described Shaboon's phone conversation
with Duncan's secretary.   The affidavit also stated, "[B]oth Dr.
Ticknor and her most recent psychiatrist expressed frustration over
May's failure to comply with longterm [sic] therapy . . . She fired
both psychiatrists once they advised treatment."

Blodgett testified in deposition that she did not type
the affidavit and did not know who did.   She stated that she had
heard that Shaboon had fired a psychiatrist, but did not recall the
source.   She testified that she had never seen Shaboon's medical
records, and could not recall talking with Shaboon about her
psychiatric treatment.   Blodgett knew Ticknor well, but could not
recall discussing Shaboon with him or any other psychiatrist.

Shaboon could not recall speaking with Duncan's
secretary, but recalled talking to Blodgett.   She asserted that she
did not intend to threaten Blodgett's children.   Rather, she meant
to express that God would be good to Blodgett's children if
Blodgett helped her.   Shaboon said she was "really stressed out,"

and that what she said in English[1] might not have represented her ideas. When asked whether she had threatened to poke the eyes out of Blodgett's children, Shaboon replied, "I would never say something like that to any child. . . . But if I said it, I might have been very stressed out and very sick."

Shaboon claimed that she had a phone altercation with Duncan on October 27. Duncan reportedly told her that she could not come back, and that the dismissal was her fault. Alluding to the Health Science Center's ten-point grading system, he reportedly told Shaboon that she was "not a two, not a one, but a zero." Shaboon broke down and went out into the street throwing money. At the request of Shaboon's mother and sister, San Antonio police picked her up, and she was hospitalized on that date.

Also on that date, Duncan notified the Tennessee Board of Medical Examiners ("Tennessee Board") that the Health Science Center had dismissed Shaboon. Shaboon was applying for a license to practice medicine in Tennessee, and Duncan had previously written an unqualified recommendation on her behalf. On November 2, Duncan told the board about Shaboon's alleged threat to Blodgett's children.

---

[1]    Shaboon is of Syrian origin, and English is not her first language.

On November 5, the Tennessee Board asked for documents relating to the dismissal. Shaboon had authorized Duncan to provide information to the board in good faith about her qualifications. Duncan sent the board Shaboon's negative evaluations and his correspondence with her. The Tennessee Board rejected Shaboon's application.

Shaboon's current lawyer sent a letter to Duncan on November 5 indicating that she wanted to appeal her dismissal. Shaboon believed throughout these events that she was entitled to a hearing if the Hospital District suspended her, but she claimed that she never received a suspension. She believed that Duncan would allow her to resume patient care after he satisfied his "ego," and that she was not suspended because she was still receiving her salary. Park told the lawyer that Shaboon had lost her appeal rights because she did not substantively respond to the October 12 letter.

Shaboon filed suit in 1994, alleging a wide variety of claims against virtually every person involved in these events. In a series of rulings, the district court dismissed most of the claims and most of the defendants. Duncan, Dollinger, and the Health Science Center are the remaining defendants.

Duncan asserted qualified immunity from Shaboon's due process, privacy, and intentional infliction of emotional distress

claims, and moved for summary judgment. The district court denied this motion, holding that fact issues remain on Duncan's qualified immunity defense.

Dollinger asserted qualified immunity from Shaboon's claims under state law for medical malpractice, gross negligence, intentional infliction of emotional distress, and fraudulent inducement, and moved for summary judgment. Shaboon countered this motion with the testimony of her expert, psychiatry professor Dr. Daniel Creson. Creson reviewed Dollinger's treatment records and deposition testimony, and opined that no reasonable doctor would have committed Shaboon on August 3. Creson also said that it was unacceptable for a psychiatrist to threaten involuntary commitment if she knew that involuntary commitment was impracticable. The court denied Dollinger's summary judgment motion, holding that Creson's testimony created a fact issue on Dollinger's qualified immunity under Texas law.

Finally, the Health Science Center moved for summary judgment on Shaboon's ADA claim. The court held that material issues of fact remained and denied summary judgment. This appeal follows the court's rulings.

### QUALIFIED IMMUNITY AND APPELLATE JURISDICTION

Federal qualified immunity protects government officials performing discretionary functions from civil damages liability.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987) (citations omitted). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

Texas official immunity is similar, but focuses solely on the objective legal reasonableness of the officer's conduct. Whether the allegedly violated right was "clearly established" is irrelevant. <u>Cantu v. Rocha</u>, 77 F.3d 795, 808-09 (5th Cir.1996).

This court may review orders denying qualified immunity to the extent that they turn on an issue of law. <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 530 (1985); *see also* <u>Cantu,</u> 77 F.3d at 803 (allowing an interlocutory appeal from an order denying Texas official immunity). Although the district court explicitly stated that material fact issues remain on the appellants' qualified immunity claims, this in itself does not preclude appellate review. <u>Behrens v. Pelletier</u>, 516 U.S. 299, 313 (1996). We may still evaluate the evidence that the district court deemed sufficiently

supported to determine whether the appellants acted reasonably as a matter of law. *See id.*[2]

We may also review arguments that Shaboon's asserted rights were not clearly established in 1993. <u>Mitchell</u>, 472 U.S. at 528. A "necessary concomitant" to this review is an evaluation of whether Shaboon had a liberty or property interest that supports her due process claim. <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991).

Finally, this court may review an interlocutory appeal based on Eleventh Amendment immunity. <u>Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 147 (1993).

### DISCUSSION

A.   Liberty Interest in Medical Residency/Clinical Privileges.

Shaboon contends, and the district court agreed, that her dismissal from the residency program infringed her constitutional liberty interests if unaccompanied by sufficient procedural protections. Further, these violations might be found to be so "clearly established" as to overcome Duncan's qualified immunity defense. These conclusions unfortunately misread the law of the

---

[2]   This court reviews orders denying summary judgment de novo, using the same standards as the district court. <u>Cantu v. Rocha</u>, 77 F.3d 795, 805 (5th Cir.1996) (applying this standard in a qualified immunity case); <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 464 (5th Cir.1999) (applying this standard in an Eleventh Amendment case).

Supreme Court and this court, under which students' due process rights are evaluated on a scale commensurate with the nature of their academic program and the type of discipline involved.   In particular, "[i]t is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and academic certification for successful completion of the program." Davis v. Mann, 882 F.2d 967, 974 (5th Cir.1989)

The only direct support for Shaboon's claimed liberty interest derives from a recent Texas Supreme Court decision, which held that there is at least a liberty interest in a graduate education giving rise to procedural due process protections. University of Texas Medical School at Houston v. Than, 701 S.W.2d 926, 930 (Tex. 1995). Than is distinguishable for several reasons. Principally, as the Texas Supreme Court noted, Than interpreted the Texas constitutional guarantee of "due course of law," a provision the court recognized as similar but not necessarily identical to the Fourteenth Amendment's due process clause.  Texas Supreme Court interpretations of Texas constitutional rights are no more than persuasive authority for federal constitutional interpretation. Second, Than, the plaintiff, was dismissed for cheating on an exam. Thus, to the extent his case casts any light on the federal due process clause, similar cases would involve student dismissals for pure misconduct.   As will be seen, this is not such a case.

16

Finally, _Than_ postdates the events here by a couple of years. For these reasons, _Than_ furnished no "clearly established law" applicable when Shaboon was dismissed.

Instead, the clearly established law includes the Supreme Court's _Horowitz_ decision and several academic dismissal cases from this court. In _Horowitz_, the Supreme Court upheld against a due process challenge the termination of a medical school student whose performance of duties was rated inadequate by the school staff. Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78, 98 S.Ct. 948 (1978). The Court emphasized its reluctance to "ignore the historical judgment of educators and thereby formalize the academic dismissal process by requiring a hearing." 435 U.S. at 90, 98 S.Ct. at 955. Moreover, the Court recognized that the complexity of the student-faculty relationship increases "as one advances through the varying regimes of the educational system." _Id._ The Court concluded that "in the academic context," the cost of imposing a hearing requirement is more likely to be detrimental in postgraduate courses than it was found to be for the high school students in _Goss_, a case involving solely behavioral discipline. _Id._, citing Goss v. Lopez, 419 U.S. 565, 594 (1975) (holding that high school students were entitled to notice and a hearing before receiving a suspension for misconduct). Rather than decide expressly whether Horowitz had a protected liberty or property

17

interest in her graduate medical education, the Court assumed the existence of some such interest and held that the student received all that the Fourteenth Amendment requires where "the school fully informed [her] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment." 435 U.S. at 85, 98 S.Ct. at 952.

This court faithfully followed Horowitz in a case where a dental resident was dismissed for performance deficiencies including tardiness and missed appointments with patients. Davis v. Mann, 882 F.2d 967, 969 n.4 (5th Cir. 1989). Citing both Horowitz and Goss, Davis observed that "[c]ourts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs." 882 F.2d at 973-74. And, pursuant to Horowitz, "Davis was not entitled to any hearing -- much less the full-blown post-termination hearing he received." 882 F.2d at 975. The student received ample notice of the charges against him and a warning of the consequences that would follow his failure to improve performance.[3]

_____

[3] While the Supreme Court did not affirmatively rule in Horowitz that a graduate school student has a liberty interest in completing his program, a separate line of authorities holds that public employees whose dismissals involve false, stigmatizing charges may suffer violations of a liberty interest if they are

18

Shaboon can prevail under these authorities only if she was dismissed solely for behavioral misconduct and if the Health Science Center, acting through Duncan, failed to accord her the minimum procedural protections owed in cases of student dismissal. The former proposition cannot be squared with Horowitz, and the latter proposition is untenable. Shaboon's dismissal was academic if it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal." Horowitz, 435 U.S. at 89-90, 98 S.Ct. at 955. In Horowitz, the Court found that a medical student's dismissal was academic even though the school warned her to improve her personal hygiene and attendance as well as her academic performance. "Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose and illness." Id. at 91 n.6, 98 S.Ct. at 955 n.6.

Here, the undisputed facts indicate that the Health Science Center dismissed Shaboon for reasons related to her fitness to perform as a doctor.    Shaboon received several negative

---

denied a hearing in which to clear their names. Rosenstein v. City of Dallas, 876 F.2d 392, 395 (5th Cir.1989).  As Shaboon was not a public employee, these cases would not apply.  And in any event, she never requested a name-clearing hearing.

evaluations and was suffering from mental problems on or after
August 3.  She departed Villa Rosa against Ticknor's recommendation
and stopped taking medication.  Smith and Ticknor indicated that
Shaboon was not ready to treat patients.  No psychiatrist ever
cleared Shaboon to return to work, and Shaboon missed clinical
rotations as a result.  Although Shaboon's intransigence might
suggest that her dismissal was disciplinary, her refusal to
acknowledge and deal with her problems furnished a sound academic
basis for her dismissal.  As a matter of law, therefore, Shaboon
was not entitled to any type of hearing and cannot claim that Dr.
Duncan violated a liberty interest in her residency.  *See also*
Davis, *supra*.

Nevertheless, Shaboon received sufficient procedural
protection even if her dismissal was solely for disciplinary
reasons.  "All that *Goss* required [for disciplinary actions] was an
'informal give-and-take" between the student and the administrative
body dismissing [her] that would, at least, give the student 'the
opportunity to characterize [her] conduct and put it in what [she]
deems the proper context.'"  Horowitz, 435 U.S. at 85-86, 98 S.Ct.
953 (quoting Goss, 419 U.S. at 584).  Shaboon was informed that her
residency was in jeopardy and of her deficient performance.  She
had several opportunities to comply with the official requests for
a review of her psychiatric records and to explain why she should

20

not be dismissed.  She was allowed to have her attorney represent her in a meeting with Duncan and Park.  Thus, Shaboon received sufficient process as a matter of law even if her dismissal was disciplinary.

We reject for the same reasons Shaboon's claim that Duncan violated a liberty interest in her clinical privileges at the Hospital District.[4]  Under the Hospital District bylaws, Shaboon had limited privileges "to treat patients under the supervision of the Active and Courtesy staff."  These privileges were part of her educational program and were not distinct from her residency.  She lost the privileges for the same academic problems that caused her to lose her residency, and so she had no right to a hearing.  Even if the dismissal was disciplinary, she received adequate process from agents of the Hospital District.  Shaboon therefore received all the process she was entitled to for her lost residency and clinical privileges.

B.   Property Interest in Clinical Privileges.

As with other forms of public employment, medical staff privileges can constitute a property interest entitling the employee to procedural due process before termination.  The district court held that a fact question exists concerning whether

---

[4]   While it is not clear whether she asserts a liberty interest in hospital privileges, we assume arguendo that she makes such a contention.

21

Shaboon had a property interest in her privileges as a medical resident working for the Hospital District.[5]  Physicians have a property interest in clinical privileges if their contracts explicitly or implicitly allow termination only for cause.  *See* Darlak v. Bobear, 814 F.2d 1055, 1061-62 (5th Cir.1987).  *See also* Caine v. Hardy, 943 F.2d 1406, 1411 (5th Cir.1991) (en banc).

As we have noted, a medical resident is not a traditional public employee for due process purposes.  But even if Shaboon was a traditional employee, cases like Darlak would not control because her agreements with the Hospital District did not establish a property interest in her clinical privileges.  Shaboon's memorandum of understanding gave her the right to discuss her grievances informally, but did not require a formal hearing; there was no implicit agreement that the Hospital District could terminate her only for cause.  The procedural protections in articles VIII and IX of the Hospital District bylaws cover only licensed physicians.[6]  Shaboon did not have a license to practice medicine, and was working under an institutional permit, a permit issued by the Texas

---

[5]    The district court also held that Shaboon did not have a property interest in her medical residency, and this ruling is not on appeal.

[6]    The bylaws protect "practitioners."  A practitioner is "an appropriately licensed allopathic or osteopathic physician with a current unlimited license, or appropriately licensed physician, podiatrist, dentist, or a dentist covered by exception under the Texas Dental Practice Act."

Board of Medical Examiners to unlicensed doctors contingent on
their participation in a residency program. Likewise, Shaboon's
VA/BCHD contract was contingent on her continuing satisfactory
performance in the residency program. Thus, Shaboon has failed to
show that these agreements created any property interest in her
clinical privileges.

Furthermore, Davis established that medical residents are
not employees protected by the due process clause. Davis v. Mann,
882 F.2d 967, 974 (5th Cir.1989). In Davis, the court found no
clear legal support for the resident's claimed property interest in
the "experience and instruction" of an ongoing residency,
notwithstanding that he was paid a salary. The court observed that
both the economic and noneconomic benefits of the employment were
inseparable from and ultimately dependent upon the plaintiff's
academic performance in the residency itself. Id. at 974. While
Davis primarily addressed property interests in residencies, its
facts are very similar and its analysis applies here. Shaboon's
limited clinical privileges only entitled her to treat patients
under the supervision of Hospital District doctors, and her stipend
was only payable while she remained a student. These privileges
were not distinct from the performance of her residency. Thus,
Shaboon had no clearly established economic or noneconomic property

interest in the limited privileges.[7]   Duncan was entitled to summary judgment on Shaboon's due process claims.

   C.   Constitutional Privacy Claim.

   Duncan argues that he is entitled to qualified immunity from Shaboon's Fourth Amendment privacy claim because his actions were reasonable even if Shaboon's allegations are true.   The district court found a fact question as to Duncan's qualified immunity because he sought Shaboon's complete medical records, allegedly disclosed Shaboon's psychiatric history to Blodgett, and mocked Shaboon's past sexual abuse.

   The Fourth Amendment, which applies to the states through the Fourteenth Amendment, bars unreasonable governmental searches and seizures.   We evaluate the alleged disclosure by balancing the intrusion on Shaboon's privacy interest against legitimate government interests.   Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1, 909 F.2d 820, 832 (5th Cir.1990).

   This court has held that medical residents like Shaboon have a reduced expectation of privacy.   Pierce v. Smith, 117 F.3d 866, 874 (5th Cir.1999) (holding that a hospital could test a resident for drugs where the resident acted strangely).   This is

---

   [7]     Because Shaboon lacked a protected property interest, we need not wade into the questions, much disputed by the parties, concerning when her clinical privileges were terminated or whether Duncan alone could effect termination.

24

because residents are both engaged in dangerous activity and operate in an educational environment where intrusions on privacy are more acceptable. *Id.* Residents "'reasonably should expect effective inquiry into their fitness and probity.'" *Id.* at 875 (citing <u>National Treasury Employees Union v. Von Raab</u>, 489 U.S. 656, 672 (1989)). <u>Pierce</u> noted that a "consequence of case-by-case balancing of interests is that there will rarely be a basis for *a priori* judgment that the disputed action violated 'clearly established' constitutional rights." 117 F.3d at 882, n.21.

This court has also held that patient safety interests can outweigh a medical staff member's privacy interest in his medical records. In *Leckelt*, a hospital requested that a nurse divulge the results of an HIV test after it received information that the nurse was gay and had been sexually involved with an AIDS carrier. This court concluded that the hospital's strong interest in protecting the health of patients justified the intrusion. *Id.* at 833.

From these authorities, it follows that Duncan did not commit clear privacy violations as a matter of law. Duncan had valid reasons to seek Shaboon's complete medical records so he could evaluate her fitness to treat patients. The alleged disclosure to Blodgett was minor and reasonable, given that

Blodgett had supervised Shaboon as a professor at the Health Science Center.

We also conclude that Duncan's alleged "mockery" of Shaboon's history of sexual abuse is not relevant to her privacy claim. There is no evidence in the record that would support a finding that others witnessed this mockery. Thus, Duncan could not have violated Shaboon's privacy. "There is no invasion of privacy when the material disclosed was already known to the recipient." *Cantu v. Rocha*, 77 F.3d 795, 807 (5th Cir.1996) (finding no invasion of privacy where a police officer disclosed information to witnesses that they already knew).

> D.   Intentional Infliction of Emotional Distress by Duncan.

Duncan contends that his treatment of Shaboon, even accepting the district court's characterization of his conduct, was not so heinous as to deny him qualified immunity under state law from her claim for intentional infliction of emotional distress. The district court found a fact question on this claim because of evidence that Duncan "managed" Shaboon's situation with little concern for her feelings.

Texas follows the Restatement (Second) of Torts § 46 approach to infliction of emotional distress. Duncan is liable if 1) he acted intentionally or recklessly; 2) his conduct was extreme and outrageous' 3) his actions caused Shaboon emotional distress;

26

and 4) Shaboon's emotional distress was severe. <u>Brewerton v. Dalrymple</u>, 997 S.W.2d 212, 215 (Tex. 1999). A claim "will not lie if emotional distress is not the intended or primary consequence of the defendant's conduct." <u>GTE Southwest, Inc. v. Bruce</u>, 998 S.W.2d 605, 611 (Tex. 1999).

To be actionably extreme and outrageous, conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and be atrocious and utterly intolerable in a civilized community. *Id.* at 611. In <u>GTE Southwest</u>, for example, the Texas Supreme Court held that an employer's two-year pattern of grossly abusive and physically threatening conduct could be outrageous. *Id.* Merely insensitive or even rude behavior, however, does not constitute extreme and outrageous conduct. *Id.* at 612. A victim's known susceptibility to emotional distress is relevant to this inquiry. <u>Motsenbocker v. Potts</u>, 863 S.W.2d 126, 132 (Tex. Ct. App.-Dallas 1993) (citing Restatement (Second) of Torts § 46 cmt. f).

A wrongful discharge is not in itself outrageous. <u>Brewerton</u>, 997 S.W.2d at 216. In <u>Brewerton</u>, the defendants made negative comments about a professor in his tenure file and recommended that he not continue on a tenure track. They also restricted his speech about the contents of his tenure folder and assigned him an excessive case load. The Texas Supreme Court held

that even if the defendants had retaliatory motives, their conduct was not outrageous. *Id.* This court has held that an employer who said he would "no longer tolerate [an employee's] health problems," excluded the employee from meetings, and refused to acknowledge her presence did not act outrageously. McConathy v. Dr. Pepper/Seven-Up Corp., 131 F.3d 558, 564 (5th Cir.1998).

Here, the actions that the district court cited were not extreme and outrageous. Duncan's alleged efforts "to obtain and keep information to himself" about Shaboon's illness, "manufacture a diagnosis", and "seclude" Shaboon suggest at most a propensity to terminate her residency unfairly. Such ill-motivated actions do not constitute legally actionable infliction of emotional distress.

More problematic, given his knowledge of her mental condition, are Duncan's alleged statements to Shaboon about her childhood sexual abuse. One Texas appellate court has held that similar remarks can be extreme and outrageous. Soto v. El Paso Natural Gas Co., 942 S.W.2d 671, 681 (Tex. Ct. App.-El Paso 1997) (finding a jury issue based on remarks ridiculing a woman's breast cancer surgery and describing her as "lopsided" and having a "plastic [breast]"). Nonetheless, we are not convinced that Duncan's alleged remarks went beyond all possible bounds of decency, and were atrocious and utterly intolerable in a civilized community. Shaboon was not exposed to these remarks over a

28

protracted period of time or physically threatened, as the plaintiffs were in <u>GTE Southwest</u>. 998 S.W.2d at 611. We therefore conclude that even accepting her allegations as true, Shaboon cannot prevail on her intentional infliction of emotional distress claim.

     E.   State law claims against Dollinger.

    Dollinger asserts that she acted reasonably when she examined Shaboon and should therefore be immune under state law from Shaboon's intentional infliction of emotional distress, gross negligence, fraudulent inducement, and medical malpractice claims. All of these claims revolve around whether Dollinger threatened Shaboon into voluntary commitment at Villa Rosa by misinforming her that she could be involuntarily committed and, if so, that she would be led away as her friends laughed at her. The district court found a fact question on whether Dollinger acted reasonably based on Dr. Creson's testimony on behalf of Shaboon.

    As an initial matter, Shaboon cannot prevail on her intentional infliction of emotional distress claim. There is no evidence that emotional distress was the intended or primary consequence of Dollinger's alleged conduct.

    Shaboon also cannot prevail on her gross negligence claim. Gross negligence is a "breach of duty involving an extreme degree of risk, considering the probability and magnitude of the

potential harm to others (an objective element) when the actor has actual awareness of the risk involved but nevertheless proceeds in conscious indifference to the rights, safety, or welfare of others (a subjective element)." General Motors Corp. v. Sanchez, 997 S.W.2d 584, 595 (Tex.1999). Neither of these elements has been satisfied here. Dollinger's alleged threats represent at most strong-arm tactics to get a patient who needed treatment to commit herself voluntarily. Dollinger had no reason to believe that medical treatment at Villa Rosa would present an extreme degree of risk to Shaboon. Nor, as even Creson admitted, is there any evidence that Dollinger was consciously indifferent to Shaboon's safety.

Shaboon has also failed to create a fact issue on her fraudulent inducement claim. Under Texas law, the elements of a fraudulent inducement claim are the same as the elements of a simple fraud claim. Hamilton v. Seque Software, Inc., 232 F.3d 473, 480 (5th Cir.2000). Shaboon must establish 1) a material representation; 2) which was false; 3) which was either known to be false when made or was asserted without knowledge of the truth; 4) which was intended to be acted upon; 5) which was relied upon; and 6) which caused injury. Id. Shaboon has presented no evidence that Dollinger said anything false or that Dollinger knew her statements were false. Shaboon has not rebutted Dollinger's

30

testimony, based on experience, that Dollinger could in fact ask the police to take Shaboon to the hospital in handcuffs. Although Shaboon presented evidence that Dollinger would have breached a standard of care by doing so, she has not presented evidence that Dollinger made the threat in bad faith. Thus, we reject Shaboon's fraudulent inducement claim.

Whether Dollinger may obtain official immunity for her alleged medical malpractice is a closer question.[8] Dollinger is entitled to Texas official immunity if she was 1) performing discretionary duties; 2) in good faith; and 3) while acting within the scope of her authority. City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). The good faith element, which is the only one at issue, is "substantially" the same as the federal "objective legal reasonableness" test:

> [T]he test is one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith. "[W]e look to whether a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."

Chambers, 883 S.W.2d at 656 (quoting Swint v. City of Wadley, 5 F.3d 1435, 1441-42 (11th Cir. 1993)). Dollinger is thus entitled

---

[8]     To commit malpractice under Texas law, Dollinger had to have breached a duty to Shaboon that proximately caused an actual injury. Urbach v. United States, 869 F.2d 829, 831 (5th Cir.1989).

to immunity "even if [she] acted negligently." Chambers, 883
S.W.2d at 655. To survive summary judgment, Shaboon had to show
that "no reasonable person in [Dollinger's] position could have
thought the facts were such that they justified [her] acts." Id.
at 657.

Courts should resolve immunity claims "at the earliest
possible stage in litigation." Hunter v. Bryant, 502 U.S. 224,
227, 112 S. Ct. 534, 536 (1991) (holding that the undisputed facts
showed that agents reasonably could have believed that probable
cause existed). This is because qualified immunity is immunity
from suit rather than a mere defense to liability. Id.
"Immunity's shield against suit is lost . . . when [government]
defendants go to trial." Presley v. City of Benbrook, 4 F.3d 405,
410 (5th Cir. 1993).

The district court found a fact issue on Dollinger's
qualified immunity defense because she allegedly used "questionable
tactics" to convince Shaboon to go voluntarily to Villa Rosa.
Dollinger's alleged threat to commit Shaboon was only questionable,
however, if no reasonable doctor could have concluded that Shaboon
satisfied the standards for involuntary commitment.

Under Texas Health & Saf. Code § 574.011(a)(7), Shaboon
warranted involuntary commitment if she was 1) mentally ill; 2)
suffering severe and abnormal mental or physical distress; 3)

32

experiencing substantial mental or physical deterioration of her ability to function independently; and 4) unable to make a rational and informed decision as to whether to submit to treatment. Dollinger testified that although Shaboon could make informed decisions, Shaboon was not thinking rationally on August 3 and satisfied the criteria for involuntary commitment.   Creson disagreed after reviewing depositions and Shaboon's records.

We conclude that a reasonable jury could not find that Dollinger failed to act with objective legal reasonableness.   There is no doubt that Shaboon was suffering from some degree of mental illness on August 3.   Ticknor's examination indicates that Shaboon was depriving herself of sleep, normal appetite, and relaxation. He wrote that she was physically exhausted and was suffering from major depression.   He also wrote that she needed hospitalization for her paralyzing obsessive-compulsive disorder.   Ticknor's examination indicates that a reasonable doctor could have found that Shaboon satisfied the criteria for involuntary commitment.

Creson's testimony fails to create an issue of fact. Granted, he testified that a reasonable psychiatrist would not have found that Shaboon met the standard for commitment.   Creson did not, however, explain his reasoning in any detail.   He did not offer a competing diagnosis for Shaboon's behavior.   He never pointed to parts of Shaboon's medical examinations as evidence that

33

she did not satisfy the standard.  He never explained which part of the standard Shaboon did not satisfy.    Creson's testimony effectively represents a bald, unexplained opinion on the ultimate issue of Dollinger's immunity.  This is not sufficient to create an issue of fact on Dollinger's official immunity.   "[U]nsupported affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  <u>Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.</u>, 922 F.2d 220, 225 (5th Cir. 1991) (affirming summary judgment on a gross negligence claim because the expert opinions for the plaintiff were conclusory and not supported by sufficient facts).

Furthermore, Creson's testimony actually suggests that Dollinger was at most negligent.  His affidavit stated only that Dollinger "violated the standard of care" and "breached the duty of care."  These are terms of negligence.  Creson testified that he had "no information" that Dollinger consciously intended to harm Shaboon or was consciously indifferent to Shaboon's rights and safety.  Although Dollinger's subjective beliefs are not at issue, Creson is effectively testifying that the circumstances did not indicate that she acted in bad faith.   <u>Chambers</u> establishes that Dollinger is immune from claims that she acted negligently.  Thus,

Creson's testimony and affidavit are not sufficient to create a fact issue on Dollinger's immunity.

Under the circumstances, therefore, we are unwilling to strip Dollinger of her official immunity from suit based on conclusory expert testimony that relies on cold medical records and transcripts to second-guess Dollinger's discretion. We conclude that Dollinger is entitled as a matter of law to official immunity from Shaboon's medical malpractice claim.

F.    State's Eleventh Amendment Immunity from ADA claim.
The Health Science Center urges its sovereign immunity under the Eleventh Amendment from Shaboon's Title II ADA claim.[9] Appellant recognizes that it is not immune from such claims under this court's decision in Coolbaugh v. State of Louisiana, 136 F.3d 430, 438 (5th Cir. 1998) (holding that states are not immune from Title II ADA claims). We will adhere to Coolbaugh and at this time deny sovereign immunity to the Health Science Center, without prejudice.

The Supreme Court recently held that states retain their Eleventh Amendment immunity from suits brought under Title I of the ADA. Board of Trustees of the University of Alabama v. Garrett, 2001 U.S. LEXIS 1700, *32-33 (2001). In so holding, however, the

---

[9]    Although the appellants did not raise this claim in the district court, they may do so now. Neinast v. State of Texas, 217 F.3d 275, 279 (5th Cir. 2000) (holding that this court may consider Eleventh Amendment immunity for the first time on appeal).

Court declined to consider whether sovereign-immunity shields the states from suits under Title II of ADA. *Id.* at *8 n.1. <u>Coolbaugh</u> would ordinarily remain governing law in this circuit unless the analysis in <u>Garrett</u> so plainly applies to Title II suits as to overrule <u>Coolbaugh</u> sub silentio. On remand, the Health Science Center may try to persuade the district court of that impact. Since neither party has sufficiently foreseen or briefed the impact of <u>Garrett</u>, it is premature for us to decide the issue.

### CONCLUSION

For the reasons stated above, we conclude that Dr. Duncan and Dr. Dollinger were entitled to summary judgment against Shaboon's claims, while the Health Science Center's immunity from her ADA Title II claim is not facially compelled by the Supreme Court's recent decision on ADA Title I sovereign immunity. The district court's judgment is **AFFIRMED** in Part, and **REVERSED** in Part.

36